# United States Court of Appeals for the Federal Circuit

05-1522

WESLEYAN COMPANY, INC.,

Appellant,

v.

Francis J. Harvey,
SECRETARY OF THE ARMY,

Appellee.


Richard L. Moorhouse, Greenberg Traurig, LLP, of McLean, Virginia, argued for appellant. With him on the brief was L. James D'Agostino.

David A. Harrington, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for appellee. On the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Brian M. Simkin, Assistant Director, and Tara K. Hogan, Trial Attorney. Of counsel on the brief was Craig S. Clarke, Supervisory Trial Attorney, Contract Appeals Division, Office of the Judge Advocate General, United States Department of the Army, of Arlington, Virginia.

Appealed from:   Armed Services Board of Contract Appeals

# United States Court of Appeals for the Federal Circuit

05-1522

WESLEYAN COMPANY, INC.,

Appellant,

v.

Francis J. Harvey,
SECRETARY OF THE ARMY,

Appellee.

_____

DECIDED:  July 17, 2006

_____

Before MICHEL, Chief Judge, NEWMAN and MAYER, Circuit Judges.

Opinion for the court filed by Chief Judge MICHEL.  Dissenting opinion filed by Circuit Judge NEWMAN.

MICHEL, Chief Judge.

Wesleyan Company, Inc. ("Wesleyan") appeals the decision of the Armed Services Board of Contract Appeals ("Board") dismissing for lack of subject matter jurisdiction its breach of contract claim against the United States.  Wesleyan Co., ASBCA No. 53896, 05-1 BCA P32,950 (April 22, 2005).  Because the Board erred in concluding that the Contract Disputes Act of 1978, § 3(a), 41 U.S.C. § 602(a) ("CDA"), does not confer subject matter jurisdiction over a portion of Wesleyan's claim, we reverse and remand.

**I**

In the early 1980s, Wesleyan communicated to the United States Army its concepts for its "FIST/FLEX" drinking system, which allows a soldier to consume liquid from a canteen without removing his protective mask, and its "FIST Fountain" system, designed to enable soldiers to fill empty canteens in a contaminated environment (collectively, "Wesleyan system"). Beginning in early 1983, and acting upon the Army's advice, Wesleyan sent the first of three unsolicited proposals for the Wesleyan system to multiple Army components. The U.S. Army's Soldier and Biological Chemical Command, U.S. Army Soldier System Center in Natick, Massachusetts ("Natick Labs") assumed responsibility for the analysis of the Wesleyan system. Natick Labs rejected Wesleyan's proposal in April 1983 because it did not contain a Defense Acquisition Regulation ("DAR") legend discussing government use of the unsolicited information.

After discussions with Natick Labs, Wesleyan resubmitted the unsolicited proposal with DAR 3-507.1(a) included and executed a Memorandum of Understanding ("MoU"), both of which prohibited the government from disclosing information in the proposal to third parties and from using the information for any purpose other than evaluating the proposal.[1]

---

[1] DAR 3-507.1(a) reads in relevant part:

> This data . . . shall not be disclosed outside the Government and shall not be duplicated, used or disclosed in whole or in part for any purpose other than to evaluate the proposal. . . . This restriction does not limit the Government's right to use information contained in the data if it is obtained from another source without restriction. . . .

(cont.)

After determining that the Wesleyan system was technically feasible, Natick Labs requested in November 1983 that Wesleyan lend a prototype system to ILC Dover, a manufacturer of protective suits and masks, for incorporation into a prototype protective suit. The bailment agreement, executed on December 1, 1983, was silent as to the safeguarding or use of proprietary data in the Wesleyan system, but did state that the bailment was being made "for the limited purpose" of determining "its use in demonstrating and testing its ability to perform the intended services". The bailment agreement expressly stated that the Wesleyan system remained Wesleyan's property.

Beginning on May 10, 1984, the Army initiated purchases of the Wesleyan systems, which were used in field tests at Natick Labs and other Army units, including the Infantry School at Fort Benning, Georgia, and the Chemical School at Fort Leonard Wood, Missouri. The Army purchased nine systems during 1984.

On January 15, 1985, the Army required Wesleyan to sign a Policy Statement for continued evaluation of the Wesleyan system. The Policy Statement contained the following clause:

> 4. The voluntary submissions will be handled in accordance with established Government procedures for safeguarding such articles or information against unauthorized disclosure. In addition, the data forming a part of or constituting the submission will not be disclosed outside the

---

The MoU reads in relevant part:

> It is understood that the Department of the Army has accepted the above proposal for the purpose of evaluating it and advising of any possible Army interest. It is further understood that such acceptance does not imply or create: . . . any relationship, contractual or otherwise, such as would render the Government liable to pay for or to give up any legal right or assume any obligation for disclosure or use of any information in the proposal to which the Government would otherwise lawfully be entitled.

Two other unsolicited proposals were submitted at later dates.

Government or be duplicated, used or disclosed in whole or in part by the Government, except for record purposes or to evaluate the proposal.

Following execution of this Policy Statement, the Army purchased an additional twenty Wesleyan systems during 1985. In January 1986, the Army required Wesleyan to execute a second, similar Policy Statement. Following execution of this second Policy Statement, the Army purchased thirty-three systems in 1988, and sixty-eight systems in 1989, for a total of 130 systems.

The Army purchases were governed by six purchase orders, all of which were silent as to the safeguarding or use of proprietary data. However, four of the six purchase orders stated that the purchases were being made for evaluative or demonstrative purposes.[2] In 1992, the Army completed its testing and terminated consideration of the Wesleyan system.

Beginning in 1996, Natick Labs initiated development of the Land Warrior / Modular Lightweight Load Carry Equipment system ("MOLLE"), which included a hydration system, and awarded a primary contract for MOLLE in May 1997 to Specialty Plastic Products of PA, Inc. ("Specialty"). The commercial hydration system then used in MOLLE was received poorly by users, and the Marine Corps noted that a large number of Marines instead were purchasing a commercially available hydration system produced by CamelBak Products, Inc. ("CamelBak"). Specialty replaced the hydration system in MOLLE with CamelBak's hydration system in 1998.

---

[2] One purchase order stated that the "[i]tems are needed at the Infantry School for a limited user evaluation", another indicated that "[t]his item is being procured as NDI prototypes, for initial evaluation to determine its acceptability with respect to the Mask Drinking System SN-CIE", a third noted that "[t]he items are urgently required for the upcoming $p^2$ $NBC^2$ Demo in April 1985", and the fourth specified that "[t]hese items are required for the upcoming Natick/HEL 1985 New Thrust Demo in August 1985."

On April 15, 2002, Wesleyan submitted a claim for nearly $21 million to Natick Labs, alleging that the Army improperly disclosed Wesleyan's proprietary data to non-governmental third parties, and that its proprietary information was subsequently incorporated into the CamelBak system. The Army Contracting Officer ("CO") issued a final decision denying Wesleyan's claim for lack of jurisdiction under the CDA on July 19, 2002, and Wesleyan appealed to the Board.

On May 7, 2004, the Board granted the Army's motion for partial summary judgment, holding that, to the extent any proprietary data was disclosed publicly in Wesleyan's patents,[3] the Army was entitled to disseminate that information. In other words, the Board held that all information disclosed to the Army and not taught by the patents was to be protected from third parties.

The Board also determined that the Army's acceptance of Wesleyan's unsolicited proposals created a contract permitting the government to use the proposal data "in accordance with the DAR legend and memoranda of understanding." The Board then held that the resulting confidentiality agreement applied only to the unsolicited proposals, not to the subsequent bailment agreement or purchases, and sua sponte requested the parties to brief whether the Board possessed subject matter jurisdiction over the dispute. Following the submission of briefs, the Army moved to dismiss for lack of subject matter jurisdiction, and the Board granted that motion on April 22, 2005.

Wesleyan appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10).

---

[3] Mr. Wesley Schneider, the president of Wesleyan, obtained patents on the FIST/FLEX and FIST Fountain systems in 1985 and 1987, respectively.

## II

The sole issue on appeal is whether the pleaded contracts are covered by the CDA. Statutory interpretation is a question of law that we review de novo. Minn. Power and Light Co. v. United States, 782 F.2d 167, 169 (Fed. Cir. 1986).

We begin our analysis with the language of the statute. Institut Pasteur v. United States, 814 F.2d 624, 627 (Fed. Cir. 1987). Pursuant to the CDA, the Board has subject matter jurisdiction over "any express or implied contract . . . entered into by an executive agency for—(1) the procurement of property, other than real property in being." 41 U.S.C. § 602(a). "Procurement" is "the acquisition by purchase, lease or barter, of property or services for the direct benefit or use of the Federal Government." New Era Constr. v. United States, 890 F.2d 1152, 1157 (Fed. Cir. 1989) (emphasis in original).

Here, three types of agreements are at issue: the unsolicited proposals; the bailment agreement; and the purchase orders. Although the bailment agreement does involve, and the unsolicited proposals arguably involve, the transfer of "property", neither involve "acquisition . . . by such means as . . . renting [or] leasing", as Wesleyan did not receive any value in exchange. As such, the unsolicited proposals and bailment agreement were donative in nature.

The purchase orders, in contrast, involve the exchange of property for money, and thus involve "procurement". The Board erred by ignoring this critical exchange. Accordingly, the Board erred by categorizing Wesleyan as a "bidder", and thus in relying on our decision in Coastal Corp. v. United States, 713 F.2d 728 (Fed. Cir. 1983). In Coastal Corp., the Army had not engaged in any "procurement" activities, and had

instead cancelled a bid solicitation prior to awarding a contract. Id. at 729. We held that the CDA "deals with contractors, not with disappointed bidders." Id. at 730. Wesleyan, however, is more than a disappointed bidder. Although here, the Army had not yet awarded Wesleyan a final contract to provide the FIST/FLEX system to soldiers, the Army had purchased FIST/FLEX prototypes for testing. This purchasing activity was sufficient to transform the Army's relationship with Wesleyan from that of evaluator and bidder to that of buyer and seller. Accordingly, Coastal Corp. is distinguishable.

We turn now to the question of whether the information contained in the purchase orders was sufficient to constitute a procurement "contract". The purchase orders specify the parties involved, delivery instructions, price, payment terms, and transportation instructions. No essential term is missing.[4] Although Wesleyan did not sign the purchase orders, it performed, which clearly signals acceptance. Taken together, the purchase orders and Wesleyan's performance contain all essential contract terms and demonstrate mutual assent to a procurement contract.

Thus, pursuant to the CDA, the Board possesses limited subject matter jurisdiction over this suit insofar as Wesleyan's claim involves a breach of the purchase orders, which constitute procurement contracts. Because Wesleyan alleges a breach of the confidentiality agreement, however, Wesleyan has stated a claim upon which relief may be granted only if the confidentiality agreement was incorporated into the procurement contracts. On remand, the Board should first determine whether language on four of the six purchase orders indicating that the Wesleyan systems are being

---

[4] The complete exchange between the parties is no doubt even more robust than the information contained in the record. For example, oral discussions are referenced on the purchase orders, and the record does not include the content of those discussions.

purchased for evaluative or demonstrative purposes is sufficient to incorporate by reference previously executed documents relating to the evaluative process, namely the confidentiality provisions of the DAR legend, MoU, and Policy Statements. If the Board answers this question affirmatively, then it may entertain only those portions of Wesleyan's complaint alleging a breach of the confidentiality agreement as incorporated into the procurement contracts. Accordingly, we turn next to Wesleyan's specific allegations of breach.

Wesleyan alleges four specific instances of breach in its complaint. First, Wesleyan alleges that conceptual information disclosed to the Army's Chemical Systems Laboratory at Aberdeen Proving Grounds, Maryland ("Aberdeen Proving Grounds") prior to the submission of its first unsolicited proposal was divulged to a direct competitor. Specifically, Wesleyan alleges that "the head of the [Army] Chemical Systems Laboratory's Mask Management Office was consulted regarding the viability of Wesleyan's hydration systems concepts" and that "[u]pon information and belief, this individual later was employed by . . . ILC Dover, Inc." (Compl. ¶ 11-13.) Because, as explained above, a CDA contract would not have arisen until the Army procured prototypes, the Board does not have jurisdiction over this portion of Wesleyan's claim.

We address Wesleyan's second, third, and fourth allegations together. Wesleyan's second allegation is that prior to June 1985, the Army improperly disclosed and conveyed concepts from the Wesleyan system to the Battelle Memorial Institute, a contractor at Aberdeen Proving Grounds. Wesleyan alleges that Battelle used Wesleyan's concepts in its June 1985 report "regarding the need to improve the Army's mask drinking system", and further alleges that "Battelle in turn revealed Wesleyan's

proprietary concepts to other contractors responsible for mask deployment and soldier hydration." (Compl. ¶ 25-27.) Third, Wesleyan alleges that "in 1986 employees of the Army's Chemical Research and Development Center ("CRDC") [a precedessor to the Army's Chemical Systems Laboratory at Aberdeen Proving Grounds] released Wesleyan's proprietary information directly to employees of ILC Dover without permission from Wesleyan." (Compl. ¶ 38.) Wesleyan explains that ILC Dover "was working with CRDC to develop a competing concept with the FIST/FLEX device." (Compl. ¶ 39.) Fourth, Wesleyan asserts that because Army files from the early 1990s contained Camelbak's brochure for its drinking system, which disclosed certain features of the FIST/FLEX design, the Army improperly disclosed to Camelbak "concepts and intellectual property contained in Wesleyan's unsolicited proposals and in the prototypes submitted for testing purposes under the above-discussed bailment agreement and purchase orders." (Compl. ¶ 60.)

Because the Army purchased some of the prototype Wesleyan systems prior to these alleged disclosures, the Board possesses jurisdiction to decide Wesleyan's remaining allegations. As explained above, the unsolicited proposals and prototype submitted pursuant to the bailment agreement do not fall within the Board's jurisdiction. To succeed, then, Wesleyan must prove that the Army obtained the confidential information that it later disclosed improperly not from the unsolicited proposals, nor from the bailment, but solely from the prototypes purchased and evaluated. In other words, to the extent Wesleyan alleges that the information disclosed improperly by the Army was gleaned solely from the prototypes purchased by the Army, the Board may entertain Wesleyan's claim.

**III**

Wesleyan made a strategic decision to pursue its claim before the Board, and this forum choice has significantly limited the scope of its potential relief. Had Wesleyan desired to pursue all allegations contained in its complaint, it could have brought suit in the United States Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491(b)(1), which grants jurisdiction over disputes involving "any express or implied contract with the United States". Indeed, because, unlike the CDA, the Tucker Act does not require that the contract with the United States relate to procurement, the Court of Federal Claims would have possessed subject matter jurisdiction here even if the Army had not purchased <u>any</u> Wesleyan systems, and had breached the confidentiality agreement solely by disclosing information contained in the unsolicited proposals and/or bailment. By opting to pursue its claim before the Board, Wesleyan limited the scope of its dispute to the CDA, and thus to the prototypes obtained through the purchase orders. Nonetheless, Wesleyan is entitled to a full and fair determination of the procurement-related portion of its claim before the Board.

**IV**

In sum, the Board possesses subject matter jurisdiction over a subset of Wesleyan's claim. Because the unsolicited proposal and bailment agreement do not involve procurement, those agreements are not subject to the CDA. Accordingly, the Board does not have jurisdiction to hear allegations of breach arising from disclosure of information acquired from the unsolicited proposals or the prototype loaned pursuant to the bailment agreement.

However, the Army also purchased prototypes from Wesleyan pursuant to purchase orders containing all essential contract terms. Accordingly, that portion of the dispute arises under a procurement contract, which the Board has jurisdiction over pursuant to the CDA. Because Wesleyan asserts a breach of the confidentiality provisions, it has stated a claim upon which relief may be granted only if the procurement contracts at issue here—the purchase orders—incorporate by reference the previously executed confidentiality provisions. To succeed on the merits, Wesleyan must prove that the Army obtained confidential information later disclosed improperly not from the unsolicited proposals, and not from the bailment, but solely from the prototypes purchased.

We thus reverse the decision of the Board dismissing Wesleyan's claim for lack of jurisdiction, and remand for further proceedings consistent with this opinion.

<u>REVERSED AND REMANDED.</u>

# United States Court of Appeals for the Federal Circuit

05-1522

WESLEYAN COMPANY, INC.,

Appellant,

v.

Francis J. Harvey,
SECRETARY OF THE ARMY,

Appellee.

NEWMAN, <u>Circuit Judge</u>, dissenting.

I respectfully dissent. The Board of Contract Appeals has jurisdiction and authority to decide all of the asserted breaches of the confidentiality provisions related to the contracts between Wesleyan and the Army with respect to this drinking mask. The court's decision, separating the various steps in this relatively simple procurement, can have large consequences for dispute resolution.

The Contract Disputes Act does not withhold from the boards of contract appeals the authority to consider the entirety of the claim. There is no basis in the Contract Disputes Act for segregating the contract-based confidentiality obligations that were incurred at the beginning and at the end of this procurement, from that in the middle. Many procurements start with an offer and then a prototype and then a larger-scale evaluation, all accompanied

by standard written confidentiality provisions. My concern with the panel majority's ruling is that it parses the various stages at which the offeror provided confidential information, when all of these stages are part of one overall supply proposition, and are part of one overall claim.

The government required a confidentiality agreement when Wesleyan submitted the prototypes, and Wesleyan then resubmitted the prototypes with the appropriate confidentiality notices in the form of Defense Acquisition Regulation legend 3-507.1(a) and a Memorandum of Understanding. We need not decide the effect of these confidentiality agreements in isolation, for the evaluation of Wesleyan's drinking system resulted in a procurement contract. The steps of the evaluation of Wesleyan's technology were part of the normal negotiation process, which in this case resulted in a contract for sale; each of the stages of the procurement were part of one overall contracting process.

The purpose of the Contract Disputes Act is to facilitate the fair and efficient resolution of contract disputes. As explained in testimony during consideration of the Act:

> It is in the Government's selfish interest to be fair in its dealings with its contractor citizens. Unfair procedures drive the most essential and efficient contractors out of competition for Government contracts, and cause those who remain, to submit consistently higher prices which neither the taxpayer nor the Nation can any longer afford. The cost of diminished competition is not readily measurable, but it is unquestionably huge.

Testimony of Judge L. Spector, *Contract Disputes: Hearings Before the Subcommittee on Administrative Law and Governmental Relations of the Committee on the Judiciary 95th Cong. First Session on H.R. 664 and Related Bills* at 107 (1978). Fairness requires not only protection of the proprietary information of contractors, but also the right to litigate the issues of proprietary information if the ensuing contract is litigated. The confidentiality

provisions herein are part of an integrated procurement, and the Contract Disputes Act gives the Board jurisdiction over disputes arising anywhere in the process. From the court's failure to recognize and authorize the Board to resolve all of the disputes associated with the contract I must, respectfully, dissent.