ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| A.A.K.C.C. | ) | ASBCA No. 60399 |
| | ) | |
| Under Contract No. 000000-00-0-0000 | ) | |

APPEARANCE FOR THE APPELLANT:      Mr. Abdul Ahad Khadim
    Director

APPEARANCES FOR THE GOVERNMENT:    Raymond M. Saunders, Esq.
    Army Chief Trial Attorney
    LTC Robert B. Nelson, JA
    LTC Timothy A. Furin, JA
    Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE HARTMAN ON THE GOVERNMENT'S MOTION TO DISMISS FOR LACK OF JURISDICTION

The government has filed a motion to dismiss this appeal for lack of jurisdiction based upon appellant's failure to submit a claim to a contracting officer (CO) prior to filing its notice of appeal. Appellant, A.A.K.C.C., has responded to the government's motion by filing a number of documents relating to its asserted contract for canal work in Afghanistan.

## STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

An undated document executed by Lieutenant (LT) Edward Olson and Abdul Ahad Khadim provides as follows:

> Abdul Ahad Khadim will assist in the supervision of the Char Bagh Canal Cash for Work Program. In addition he will provide any skilled and mechanical labor required to fully repair the Char Bagh Canal System.
>
> —Includes all Excavation Rental Stone Masonry Section
> —Preference for Hiring Workers is to local Villages
> Cost= $45,117
> Payment POC: 1LT Edwards
> Site    POC: 1LT Olson
> CFW    POC: 1LT Chastain

(R4, tab 15)  A "MEMORANDUM FOR RECORD" dated 12 April 2011, bearing the name of Lieutenant Colonel (LTC) Rodger S. Lemons, "Commanding," "Department of the Army, B Company, 1st Battalion, 66th Armor Regiment, 1st Brigade Combat Team, 4th Infantry Division, Kandahar, Afghanistan," addresses the subject of "Eastern Char Bagh Cash for Work Canal Cleaning program" and provides:

1. **Synopsis**:  The town of Char Bagh (Vic 41R QR 50675 03900) is dependent on its canal system as its economic foundation and farming support.  This project repairs the canal system to enable farming and later improvement to the canals.

2. **Narrative**:  Canals in the Char Bagh area are central to farming in the area, and require cleaning in order to remain effective.

3. **Justification**:  The project repairs the canals that are central to farming operations in the area.  The project will support current farming operations and enable later projects to fortify the canal system to require less consistent maintenance.  It will cost approximately 225000 Afghani to support.

(R4, tab 3) (Emphasis in original)  Virtually identical "MEMORANDUM OF RECORD" bearing the name of LTC Lemons exists for the dates of 13, 14, 15, and 16 April 2011 (R4, tabs 3-11).

In an email dated 17 April 2011 (R4, tab 12), Abdul Ahad Khadim, who listed his title as "President of Abdul Ahad Khadim Construction Company (A.A.K.C.C.)" and address as "Kandahar, Afghanistan," advised LT Olson:

Attached is the final invoice for the subjected project and a copy of contract signed between me and you.  Please let me know when I shall expect to receive the money.

Attached to the email were a "Final Invoice" (R4, tab 13), and a copy of the handwritten document quoted above executed by LT Olson and Abdul Ahad Khadim (R4, tab 15). The invoice, which was on A.A.K.C.C. letterhead, stated the project name was "Canal Work in Char Bagh Village," and provided in pertinent part as follows:

2

| DESCRIPTION | QTY | UNIT | UNIT PRICE | EXTENDED PRICE |
|---|---|---|---|---|
| Mobilization & Demobilization | 1 | L.S | 100000 | 100000 |
| Stone Massonry | 50 | M/L | 3000 | 150000 |
| Stone Massonry | 50 | M/L | 3000 | 150000 |
| New Canal | 1500 | M/L | 600 | 900000 |
| Cleaning | 1725 | M/L | 200 | 345000 |
| Site Cleaning | 1 | L.S | 100000 | 100000 |
| Administration Cost | 5 | % | 20900 | 104500 |
| Security | 5 | % | 20900 | 104500 |
| Transportation | 5 | % | 20900 | 104500 |
| | | | TOTAL | AFA 2,058,500 |
| | | | Total in US$ | USD 45,117 |

(R4, tab 13) In response to his email, Abdul Ahad Khadim received an email dated 18 April 2011 from LT Olson stating:

> Attached are the letters that will get you paid, you will need to take them in, 2 at a time in order to receive payment.
>
> Thanks

(R4, tab 14) Attached to LT Olson's email appear to have been copies of the Memorandum of Record of various dates bearing the name of LTC Lemons (*compare* R4, tab 14, *with* R4, tabs 3-11). Abdul Ahad Khadim by email of the same date (R4, tab 14 at 2), thanked LT Olson for the letters needed to get paid and asked:

> Where shall I take them in?
>
> How much time will be required between each payment?

LT Olson responded by email the same day as follows:

> Take them to the OCC-D and speak with LT Edwards.
> Start on Wednesday and leave 1-2 days between visit. I will send him an email for you.

(R4, tab 14 at 3) By email sent at 10:39 pm the same date (*id.* at 4), Abdul Ahad Khadim advised LT Olson as follows:

> It is my pleasure to meet Mr Edwards more and more. The more I meet him, The more I can ask him for further projects in whole Arghandab District.

3

Thank you once again for cooperation, I wish I can work
with you for further projects too in Char Bagh.
The Designs for Rajan Kala Masques have been Completed,
Me and my engineer are working togather [sic] on its price
quote, We will submit that one too as soon as we complete
it.  [Punctuation and syntax in original]

By email dated 1 January 2016, Abdul Ahad Khadim notified the Armed
Services Board of Contract Appeals (ASBCA) as follows:

In April 2011 me and 1LT Olson Edwards signed a contract
for canal cleaning in Char Bagh Village, Kandahar,
Afghanistan.

The total amount of the project was $45,117.

I completed the project and sent him the invoice.

I was paid $15,000 of them, I was not paid rest of them
which was $30,117.

At that time, I did not know about your authority.

Now I request you to register and proceed [sic] my claim
and help in providing justice.

The Board docketed the matter as ASBCA No. 60399 on 4 January 2016.

On 20 February 2016, Abdul Ahad Khadim sent an email to the ASBCA
requesting the appeal be stayed for a period of 12 months to allow him "to come to the
USA" and "visit the law houses to find a perfect lawyer for my Claim(s)."  Four days
later, the government filed an opposition to the request for a 12-month stay and a
motion to dismiss for lack of jurisdiction.  The ASBCA's Recorder notified the parties
by letter dated 4 March 2016 that the Board would consider appellant's request for an
extended suspension after resolving the government's motion to dismiss for lack of
jurisdiction and appellant shall have 30 days, to and including 3 April 2016, within
which to file a response to the government's motion to dismiss.

On 7 March 2016, appellant sent the ASBCA by email a number of photos of work
being performed at the canal that appeared to also have been sent to LT Olson during
April 2011, and emails indicating that (a) LT Olson asked A.A.K.C.C. for a copy of a
bridge assessment it had completed that he wished to share with his commander and (b)
met with Abdul Ahad Khadim at the canal on or about 8 April 2011 regarding the canal

4

work. Appellant did not, however, file any written response addressing the government's assertion that the ASBCA lacks authority to entertain its appeal.

## LEGAL FRAMEWORK

The U.S. Department of State is the government's lead foreign policy agency. It sets overall policy for supply of foreign assistance in a given country or region and coordinates actions of other agencies administering U.S. foreign assistance, such as the U.S. Agency for International Development (USAID). Pub. L. No. 87-195, 75 Stat. 424 (codified as amended at 22 U.S.C. § 2151); Exec. Order No. 10973, *available at* https://bulk.resource.org/gao.gov/ 87-195/000057A0.pdf; 22 U.S.C. § 2656; Carl B. Kress, *The United States Government and Post-Conflict Economic Reconstruction*, 11 UC DAVIS J. OF INT'L L. & POL'Y 75, 85 (2004). The State Department possesses the legal authority and funding to conduct foreign assistance pursuant to the Foreign Assistance Act of 1961, 22 U.S.C. § 2151. When contracting with entities to deliver U.S. foreign assistance, USAID operates in accord with federal contracting regulations. It normally takes USAID eight or more months to conduct a "full and open" competition for complex services or supplies and award a contract based on a weighted combination of cost and technical considerations. *See* Kress, *The United States Government and Post-Conflict Economic Reconstruction*, 11 UC DAVIS J. OF INT'L L. & POL'Y at 85; Jeffrey Marburg-Goodman, *USAID's Iraq Procurement Contracts: Insider's View*, 39 THE PROCUREMENT LAWYER Fall 2003 at 10-12 (A.B.A.), *available at* http:// pdf.usaid.gov/ pdf_docs/Pcaab390.pdf; *see generally Shams Eng'g & Contracting Co. and Ramli Co.*, ASBCA Nos. 50618, 50619, 98-2 BCA ¶ 30,019 at 148,522; *STV/Lyon Assocs., Inc.*, ASBCA No. 49871, 97-1 BCA ¶ 28,765.

Except for interoperability and safety training of foreign forces, the Department of Defense (DoD) funds foreign aid or assistance only pursuant to an express statutory exception. During 1984, the Comptroller General ruled that the Army had violated fiscal law (specifically 31 U.S.C. § 1301(a)) when it used Operation and Maintenance (O&M) funding to provide humanitarian assistance in Honduras absent an interagency order or agreement under the Economy Act because Congress had designated other funds for that purpose under the Foreign Assistance Act of 1961. The Honorable Bill Alexander, B-213137, 63 COMP. GEN. 422 (1984); LTC Mark Martins, *No Small Change of Soldiering: The Commander's Emergency Response Program (CERP) in Iraq and Afghanistan*, ARMY L. at 15 n.106 (Feb. 2004), *available at* http://www.jagcnet.army.mil/ DOCLIBS/ARMYLAWYER.NSF (citing Foreign Assistance Act §§ 531-35 (22 U.S.C. §§ 2346-46d)) (it is intent of Congress military units not undertake development or infrastructure construction projects typically funded within programs managed by State Department and USAID); *Operational Law Handbook* 215 (Judge Advocate Gen. Legal Ctr. & Sch., 2011), *available at* https://www. loc.gov/rr/frd/ Military_Law /pdf/operational-law-handbook_2011.pdf; *The Commander's Emergency Response Program (CERP)*, ATP

1-06.2 (Headquarters, Department of Army) (April 2013), *available at* http://armypubs. us.army.mil/ doctrine/index.html.

In April of 2003, days after the toppling of the statue of Saddam Hussein in Baghdad, Iraq, U.S. soldiers found about $650 million in cash in aluminum boxes in a residential cottage of regime officials and another $112 million in cash hidden in a nearby animal shelter. Evidence that this cash had been obtained by illicit skimming of oil sale profits in violation of United Nations sanctions caused coalition leaders to reject the notion that individual senior Ba'athists were rightful owners of the property and U.S. Central Command (CENTCOM) announced coalition forces were taking possession of and safeguarding "movable property" of the State of Iraq, rather than personal property of its citizens. DoD, in coordination with the Office of Management and Budget, determined that the seized funds were not to be regarded as miscellaneous receipts of the U.S. because such funds were not received "for the Government" within the meaning of federal appropriations law (*see* 31 U.S.C. § 3302(b)). Due to an urgent need for humanitarian response in Iraq and availability of the seized regime cash, the Coalition Commander established a "Brigade Commander's Discretionary Recovery Program to Directly Benefit the Iraqi People." In June of 2003, the Administrator of the Coalition Provisional Authority (CPA), Ambassador Paul Bremer, renamed the program and formally linked it to governing law and authorities relating to Iraqi property. Having been delegated authority by the Deputy Secretary of Defense over "Certain State-or-Regime-Owned Property in Iraq," Ambassador Bremer signed a memorandum on 16 June 2003 re-delegating some of that authority to the Commander of Coalition Forces. The memorandum authorized the Commander "to take all actions necessary to operate a Commanders' Emergency Response Program (CERP)" to "respond to urgent humanitarian relief and reconstruction requirements within their areas of responsibility, by carrying out programs that will immediately assist the Iraqi people and support the reconstruction of Iraq." Accordingly, CERP was created as a commander-run program utilizing non-appropriated funds. Martins, *No Small Change of Soldiering,* ARMY L. at 3, 5-6 & n.17, at 19, 26, 32, 33, *available at* http://www.jagcnet.army.mil/ DOCLIBS/ ARMYLAWYER.NSF; *accord* LTC Thomas D. Netzel, *Commander's Emergency Response Program: An Effects Based Approach* at 6 (U.S. Army War College Strategy Research Project 2013), *available at* http://oai.dtic.mil/oai/oai?verb=getRecord& metadataPrefix=html &identifier= ADA589298; Kress, *The United States Government and Post-Conflict Economic Reconstruction,* 11 UC DAVIS J. OF INT'L L. & POL'Y, No. 1 at 81; Heidi L. Osterhout, *No More "Mad Money": Salvaging the Commander's Emergency Response Program,* 40 PUB. CONT. L.J. 937, 938-39 (Summer 2011).

Combat units normally are not equipped with either contracting authority or monetary resources to hire substantial numbers of local workers. CERP, however, provided military commanders access to seized Hussein Regime cash to accomplish local reconstruction activities. Kress, *The United States Government and Post-Conflict Economic Reconstruction,* 11 UC DAVIS J. OF INT'L L. & POL'Y at 81; Martins, *No Small*

*Change of Soldiering,* ARMY L. at 4-6, 12-15, 19 & n.35, *available at* http://www. jagcnet.army.mil/ DOCLIBS/ ARMYLAWYER.NSF. CERP was considered a tool in the form of "money" commanders could utilize on projects within their area of responsibility to foster goodwill between residents and coalition forces, to shed a positive light upon the government of the supported nation, and to "delegitimize" the insurgency. It was part of a military methodology known as "Money as a Weapons System" designed to win both the hearts and minds of the population to reduce violence and defeat insurgent threats. USAID monies for "reconstruction" normally are coordinated through both the combatant command and State Department (requiring long lead times for approval), and thus can be problematic if commanders are dealing with counterinsurgency (COIN) operations, which often are very fluid and require a short lead time to obtain desired effects. In sum, CERP enabled ground commanders to very quickly focus money upon priority targets to realize desired effects in a difficult COIN environment. *Commander's Guide to Money as a Weapons System* at i, 1, 13-17 (Center for Army Lessons Learned Apr. 2009), *available at* http://www.usma.edu/ cnrcd/siteassets/sitepages/ government%20publications/ call% 20maaws% 20handbook% 2009-27%20%28april% 2009%29.pdf; *see* Martins, *No Small Change of Soldiering,* ARMY L. at 12 (streamlined procedures under which seized regime cash could be spent was compared to delays plaguing reconstruction funds handled by USAID), *available at* http://www.jagcnet.army.mil /DOCLIBS/ARMYLAWYER.NSF.

Given the slow pace at which Iraq non-military reconstruction efforts were proceeding, Ambassador Bremer decided to fund the CERP with additional millions of seized assets in excess of the original spending cap for the program. From early June to mid-October of 2003, commanders executed more than 11,000 construction projects such as schools, medical clinics, roads, sewers, and water treatment facilities. Martins, *No Small Change of Soldiering,* ARMY L. at 9-11 & n.68, *available at* http://www.jagcnet.army.mil/DOCLIBS/ARMYLAWYER.NSF.

The captured funds, however, would not last forever so a request for more funding from Congress was attached to the Global War on Terrorism supplemental appropriation request by CENTCOM. By the time the administration was prepared to request a specific dollar amount for CERP funding, the House and Senate versions of the supplemental appropriation were almost ready to be sent to the joint conference charged with reconciling remaining differences. Before conference start, managers of the House bill included a provision authorizing expenditure of up to $180 million of DoD O&M funds for CERP in Iraq and to establish a similar program for commander use in Afghanistan. *See* H.R. Rep. No. 108-312 at 31 (2003), *available at* http:// asafm.army.mil/Documents/OtherDocuments/CongInfo/BLDL/HR//04SUPh.pdf. Upon receiving the House version of the bill, Senate Appropriations Committee staffers identified the CERP provision as one that had not been part of the President's original request, and sought more information on what "CERP" was and on how such a provision would be implemented if it became law. The Joint Staff briefed Senate staffers, explaining CERP funding (when well-spent) persuaded Iraqis the coalition was

truly committed to their well-being, increased the flow of intelligence to commanders and soldiers about hostile actors in the community, and improved security and economic conditions. While Senate staffers were concerned especially with the administration's request O&M funding be available for use "notwithstanding any other provision of law," in both oral replies and follow-up written submissions, the Joint Staff maintained this phrase was essential to keeping the CERP a flexible and responsive tool, unencumbered by procedures normally associated with procurement. In response to one question concerning the phrase, the Joint Staff stated in writing:

> OGC, the General Counsel for CPA, and OCJCS Legal Counsel all believe that the language is important because Commanders using CERP funds right now are not using Armed Services Procurement Act, Competition in Contracting Act, Foreign Claims Act, and myriad other procedures that would arguably be required by law and implementing regulations (e.g., the Federal Acquisition Regulation) were CERP to be funded with U.S. appropriations. Also without the "notwithstanding" language, various provisions of past, current and even future Foreign Operations Appropriations Acts or organic Foreign Assistance legislation, could arguably be said to apply to the program were it to become funded, as proposed, with appropriated funds. In short, the "notwithstanding" phrase is intended to keep the program the useful tool that it is for commanders in the field and not have it encumbered by processes and procedures in other provisions of law.

The Joint Staff subsequently received word that the Senate would recede to the House version of the CERP provision, which had amended the administration's request by adding a quarterly reporting requirement. After a week of debate on other aspects of the legislation, both houses passed the bill, which authorized commanders to continue CERP with "appropriated" funds and expressly provided:

> SEC 1110. During the current fiscal year, from funds made available in this Act to the Department of Defense for operation and maintenance, not to exceed $180,000,000 may be used, **notwithstanding any other provision of law**, to fund the Commander's Emergency Response Program, established by the Administrator of the Coalition Provisional Authority for the purpose of enabling military commanders in Iraq to respond to urgent humanitarian relief and reconstruction requirements within their areas of

8

responsibility by carrying out programs that will immediately assist the Iraqi people, and to establish and fund a similar program to assist the people of Afghanistan: Provided, That the Secretary of Defense shall provide quarterly reports, beginning on January 15, 2004, to the congressional defense committees regarding the source of funds and the allocation and use of funds made available pursuant to the authority provided in this section.
[Emphasis added]

On 6 November 2003, the President signed the bill into law and effective fiscal year (FY) 2004 "federal appropriations" could be utilized for the first time to fund CERP projects in Iraq and Afghanistan. Emergency Supplemental Appropriations Act for Defense and for the Reconstruction of Iraq and Afghanistan, 2004, Pub. L. No. 108-106, § 1110, 117 Stat. 1209, 1215; H.R. Conf. Rep. 108-337, at 7 (2003), *available at https://www.congress.gov/bill/108th-congress/house-bill/3289/text/pl;* The White House, Remarks by the President at the Signing of H.R. 3289 (Nov. 6, 2003), *available at* https://georgewbush-whitehouse.archives.gov/news/releases2003/11/20031106-4.html; Martins, *No Small Change of Soldiering,* ARMY L. at 9-11, *available at* http://www.jagcnet.army.mil/DOCLIBS/ARMYLAWYER.NSF.

The Under Secretary of Defense (Comptroller) issued guidance on use of appropriated CERP funds on 25 November 2003, recognizing CERP is "a very powerful tool for the military commanders in carrying out their current security and stabilization mission" and expressing the DoD's intent appropriated CERP funding "preserve the same flexibility and responsiveness...maintained with the original CERP that was funded with seized Iraqi assets." The guidance tasked CENTCOM and the Department of the Army to develop operating procedures for use of such funds. LTC Mark S. Martins, *The Commander's Emergency Response Program, 37* JOINT FORCE QUARTERLY 46, 50 (Nat. Defense U. 2005), *available at* http://www.dtic.mil/dtic/tr/fulltext/u2/a523853.pdf. The Army subsequently promulgated procedures for spending funds appropriated for CERP in fragmentary orders and a regularly updated manual called *Money as a Weapon System* (often called "the MAAWS"). Osterhout, *No More "Mad Money,"* 40 PUB. CONT. L.J. at 947 & n.84.

During October 2004, Congress enacted the Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, 118 Stat. 1811, to authorize appropriations for FY 2005 defense activities, including $500 million for CERP. In section 1201(c) of the Act, Congress expressly granted the Secretary of Defense, "for purposes of the exercise of the authority...making funding available for [CERP]," "the authority to waive any provision of law...that would (but for the waiver) prohibit, restrict, limit or otherwise constrain the exercise of that authority." *Id.* at 2078.

9

In April 2005, DoD issued a new financial management regulation, DoD 7000.14-R, vol. 12, ch. 27, *available at* http://comptroller.defense.gov/Portals/45/ documents/fmr /archive/12arch/12_27.pdf, addressing CERP which provided:

2703    RESPONSIBILITIES

270301. Under Secretary of Defense (Comptroller) (USD(C)). The USD(C) shall establish and supervise the execution of principles, policies and procedures to be followed in connection with the CERP, and ensure that congressional oversight committees are timely informed of CERP activities through the quarterly reports required....

270302. Secretary of the Army. Pursuant to [DoD Directive 5101.1, "DoD Executive Agents," 23 Sept. 2002], the Secretary of the Army shall serve as executive agent for the CERP, and in that capacity shall promulgate detailed procedures as necessary to ensure that unit commanders carry out the CERP in a manner consistent with applicable laws, regulations, and this guidance....

....

270408. Contracts and Grants. U.S. appropriations and other funds made available for the CERP may be expended through contracts and grants that are prepared and executed in accordance with regulations designed to ensure transparency, fairness and accountability. **To the maximum extent practicable, these regulations shall be consistent with Coalition Provisional Authority Memorandum Number 4, Contract and Grant Procedures Applicable to Vested and Seized Iraqi Property and the Development Fund for Iraq, dated August 19, 2003.** [Emphasis added]

CPA Memorandum No. 4 provided that contracts funded from vested and seized Iraqi property were not subject to the Contract Disputes Act of 1978, as amended (then codified at 41 U.S.C. §§ 601-613), but such contracts could include a "disputes" clause providing that the parties' failure to reach agreement "on any request for equitable adjustment, claim, appeal, or action arising under or relating to th[e] contract" was a "dispute" pursuant to Federal Acquisition Regulation (FAR) 52.233-2 that could be appealed exclusively to the ASBCA. *See generally Agility Logistics Servs. Co. KSC*, ASBCA No. 57415 *et al.*, 15-1 BCA ¶ 35,840 at 175,263; *MAC Int'l FZE*, ASBCA

No. 56355, 10-2 BCA ¶ 34,591 at 170,510; *Laudes Corp. v. United States*, 84 Cl. Ct. 298, 303 (2008).

Congress continued to authorize funds for CERP after FY 2005. *E.g.,* Ike Skelton National Defense Authorization Act for Fiscal Year 2011, Pub. L. No. 111-383, § 1212, 124 Stat. 4137, 4389-4390 (2011); National Defense Authorization Act for Fiscal Year 2010, Pub. L. No. 111-84, § 1222, 123 Stat. 2518 (2009); Department of Defense Appropriations Act, 2010, Pub. L. No. 111-118, § 9005, 123 Stat. 3409, 3465 (2009); Duncan Hunter National Defense Authorization Act for Fiscal Year 2009, Pub. L. No. 110-417, § 1214, 122 Stat. 4356, 4630 (2008); National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1205, 122 Stat. 3, 366 (2008); Department of Defense Appropriations Act for Fiscal Year 2007, Pub. L. No. 109-289, § 9006, 120 Stat. 1257, 1306 (2006); National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, § 1202, 119 Stat. 3136, 3455 (2006); Emergency Supplemental Appropriations Act for Defense, the Global War on Terror and Tsunami Relief, 2005, Pub. L. No. 109-13, § 1006, 119 Stat. 231, 243 (2005).

In April 2009, the Army issued a commander's guide to MAAWS, which stated that projects to "increase agricultural production" and "repair or reconstruct irrigation systems, including canal cleanup" were among the specific uses for CERP funds. *Commander's Guide to Money as a Weapons System* at 15, 67, *available at* http:// www.usma.edu/cnrcd/siteassets/sitepages_/Government publications/call maaws handbook 09-27(april 09).pdf. The same month, the Joint Contracting Command-Iraq/Afghanistan issued an Acquisition Instruction stating that:

> CERP is a battlefield tool that commanders can use to create an immediate effect on the ground. Congress and DoD recognized this and made sure only a minimum of rules apply to CERP.

The instruction further stated "[n]o CERP...contract...shall include any clauses by reference." Rather, "all clauses shall be included in full text only." *Joint Contracting Command Iraq/Afghanistan Acquisition Instruction* at 28 (1 April 2009), *available at* https://acc.dau.mil/adl/en-US/233923/file/43754/ JCCIA%20Acq%20Instruction% 2020090401.pdf.

On 10 May 2010, the Deputy Secretary of Defense issued a memorandum providing:

> Pursuant to the authority provided in section 1202 of the National Defense Authorization Act for Fiscal Year 2006 (Public Law 109-163), as amended, and section 9005 of the Department of Defense Appropriations Act, 2010

(Public Law 111-118), the Secretary of Defense is authorized to use funds made available to the Department of Defense for operation and maintenance to enable military commanders in Iraq and Afghanistan to respond to urgent humanitarian relief and reconstruction requirements within their areas of responsibility by carrying out programs that will immediately assist the Iraqi and Afghan people, respectively.

Given the importance of the Commander's Emergency Response Program (CERP) to the Department's counterinsurgency strategy in Afghanistan and Iraq, the purpose of this memorandum is to update oversight processes and clarify the roles and responsibilities of Components implementing the program.

I hereby establish a CERP Steering Committee (CSC) to provide senior-level oversight of CERP activities. The Under Secretary of Defense for Policy (USD(P)) and the Under Secretary of Defense (Comptroller)(USD(C)), or their designees, shall serve as co-chairs of the CSC. The co-chairs will report to the Deputy Secretary of Defense....

....

I affirm the designation of the Secretary of the Army as DoD Executive Agent for the CERP, pursuant to DoD Directive 5101.1, "DoD Executive Agents," dated September 23, 2002, and consistent with guidance provided in DoD 7000.14-R, "DoD Financial Management Regulations," Volume 12, Chapter 27.

Memorandum from the Deputy Secretary of Defense to Secretaries of the Military Department's, Chairman of the Joint Chiefs of Staff, Under Secretaries of Defense, Commanders of the Combatant Commands, and others (10 May 2010), *available at* http://www.oaa. army.mil/FetchFile.ashx?DocID=347. Two weeks later, on 24 May 2010, the Deputy Secretary of Defense issued another memorandum regarding "Waiver of Limiting Legislation for Commander's Emergency Response Program (CERP)" further providing:

Section 1202 of the National Defense Authorization Act (NDAA) for FY 2006 (Public Law 109-163), as amended by section 1205 of the NDAA for FY 2008

(Public Law 110-181), section 1214 of the Duncan Hunter NDAA for FY 2009 (Public Law 110-417), and section 1222 of the NDAA for FY 2010 (Public Law 111-84) authorizes the use of Department of Defense Operation and maintenance funds in FY 2010 for the CERP established for Iraq, and a similar program for Afghanistan.

Section 1202, as amended, also authorizes the Secretary of Defense to waive any provision of law that, if not waived, would prohibit, restrict, limit, or otherwise constrain the exercise of authority under CERP during FY 2010.

The nature of the CERP precludes the application of federal procurement and contracting rules, and requires payments to individuals and other nongovernmental entities that may not be consistent with federal laws, or are subject to military claims laws and procedures. This memorandum records my **waiver of the following provisions of law, effective October 1, 2009, and applies to future extensions and expansions of the CERP authority, provided the waiver provision remains unchanged**:

- Title 10, United States Code (USC) Chapters 137, 140, and 141, relating to federal procurements.

- Title 41, USC Chapter 4, relating to federal procurements.

- Title 10, USC Chapter 163, relating to military claims.

- Title 22, USC Chapter 32, relating to foreign assistance. [Emphasis added]

Memorandum from the Deputy Secretary of Defense to Secretaries of the Military Departments, Chairman of the Joint Chiefs of Staff, Under Secretaries of Defense, Commanders of the Combatant Commands, and others (24 May 2010) *available at* http://www.oaa.army.mil/aea_attributes.aspz?ID=203.

When Congress extended authority for CERP to FY 2011, the provision allowing for waiver of any provision of law that, if not waived, would prohibit, restrict, limit, or otherwise constrain exercise of authority under CERP remained unchanged.

Ike Skelton National Defense Authorization Act for Fiscal Year 2011, Pub. L. No. 111-383, § 1212, 124 Stat. 4389-4391. The waivers by the Deputy Secretary of Defense of statutory provisions relating to federal procurements thus continued in effect during FY 2011.

The Department of Defense created this Board by Charter. Part 1, paragraph 1 of our Charter, in effect on the date of the notice appeal, provided as follows:

> There is created the Armed Services Board of Contract Appeals which is hereby designated as the authorized representative of the Secretary of Defense, the Secretary of the Army, the Secretary of the Navy and the Secretary of the Air Force, in hearing, considering and determining appeals by contractors from decisions of contracting officers or their authorized representatives or other authorities on disputed questions. **These appeals may be taken (a) pursuant to the Contract Disputes Act of 1978 (41 U.S.C. Sections 7101-7109), (b) pursuant to the provisions of contracts requiring the decision by the Secretary of Defense or by a Secretary of a Military Department or their duly authorized representative, or (c) pursuant to the provisions of any directive whereby the Secretary of Defense or the Secretary of a Military Department or their authorized representative has granted a right of appeal not contained in the contract on any matter consistent with the contract appeals procedure. The Board may [also] determine contract disputes for other departments and agencies by agreement as permitted by law.**

48 C.F.R. ch. 2, appx. A, pt. 1 (2007).

### DECISION

A.A.K.C.C. contends it entered into a one-page "contract" with the Department of the Army executed by LT Edward Olson for performance of skilled and mechanical labor required to fully repair the Char Bagh Canal System in Afghanistan and has not been paid fully the amount agreed upon for such work, $45,117. It submits to us "MEMORANDUM OF RECORD" by LTC Rodger Lemons, "Commanding, Department of the Army, B Company, 1st Battalion, 66th Armor Regiment, 1st Brigade Combat Team, 4th Infantry Division, Kandahar, Afghanistan," for five different dates in April 2011 stating the canals in Char Bagh area "are central to farming in the area,"

14

"require cleaning in order to remain effective," and project repairs are justified because the "canals [] are central to farming operations in the area."

The Department of the Army moves to dismiss A.A.K.C.C.'s appeal for lack of jurisdiction based on failure "to submit a claim to a contracting officer prior to filing its notice of appeal." It contends the Board's jurisdiction under the CDA is predicated upon a written claim by the contractor. (Gov't mot. at 1-2)

Submission of a claim by the contractor to the government's CO is a jurisdictional prerequisite where a contractor is pursuing a contractor claim under the Contract Disputes Act (CDA). *E.g.,* 41 U.S.C. § 7103; *Parsons Global Servs. v. McHugh,* 677 F.3d 1166, 1170 (Fed. Cir. 2012). Accordingly, the initial or threshold issue for resolution is whether the contract alleged is one "governed by the CDA." If it is not, a failure to satisfy a CDA requirement cannot be a basis for dismissal of the appeal.

Contrary to the assertion of the Army, the contract upon which A.A.K.C.C. premises its appeal is not a contract governed by the CDA, 41 U.S.C. §§ 7101-7109. The one-page document relied upon by A.A.K.C.C., which appears to have been executed by LT Olson and justified by LTC Lemons, Commander, Department of the Army, B Company, 1st Battalion, 66th Armor Regiment, 1st Brigade Combat Team, 4th Infantry Division, during April 2011 in Afghanistan appears, on its face, to be an agreement for performance of work pursuant to the Commander's Emergency Response Program, commonly known as CERP. The work to be performed under this agreement is work specifically authorized under CERP, i.e., increase of "agricultural production" and "canal cleanup." *Commander's Guide to Money as a Weapons System* at 15, 67, *available at* http://www.usma.edu/ cnrcd/ siteassets/ sitepages/Government publications/ call maaws handbook 09-27 .pdf; *Latifi Shagiwall Constr. Co.,* ASBCA No. 58872, 15-1 BCA ¶ 35,937 at 175,631. Also, there was a "justification" to enter into this agreement issued by an Army Commander indicating the work being performed was in response to an urgent humanitarian and reconstruction need within the Commander's area of responsibility in Afghanistan and designed to assist the Afghan people. *See* Ike Skelton National Defense Authorization Act for Fiscal Year 2011, Pub. L. No. 111-383, § 1212, 124 Stat. 4137, 4389-4390); National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, § 1202, 119 Stat. 3136, 3455-56. As we discussed above, humanitarian and reconstruction needs in a foreign nation are not generally addressed by DoD through the use of appropriated O&M funds other than pursuant to a CERP contract.

While not cited by the Army in its motion to dismiss here, we have previously issued a decision addressing whether a CERP contract is governed by the CDA. In *Latifi Shagiwall,* 15-1 BCA ¶ 35,937 at 175,633, we expressly held that "the CDA is not applicable to a CERP contract."

15

In issuing that decision, *id.* at 175,633-34, we did not cite or discuss any of our early decisions where we dismissed *pro se* appeals premised upon a CERP contract for lack of jurisdiction for failure to submit a claim in accordance with the requirements of the CDA. *Esood Al Blad Company*, ASBCA No. 58425, 14-1 BCA ¶ 35,572 at 174,331; *Favor Company*, ASBCA No. 58843, 14-1 BCA ¶ 35,778 at 175,028; *Zara Company*, ASBCA No. 58632, 14-1 BCA ¶ 35,588 at 174,381; *cf. Anwar Alsabah Company*, ASBCA No. 59737-957, 15-1 BCA ¶ 35,907 at 175,525 (authority to issue order under Board Rule 1(a)(5) directing issuance of CO decision "presupposes jurisdiction" under the CDA).[1] As a result, although we have repeatedly held we lack jurisdiction to entertain appeals that involve CERP contracts, confusion may exist as to our basis for holding we lack jurisdiction over such claims. To the extent the Army is asking us to revisit the issue of CERP contracts not being governed by the CDA and disregard our most recent decision in *Latifi*, we set forth below in detail our legal rationale and adhere to our holding in *Latifi* that the "CDA is not applicable to a CERP contract."

In establishing the parameters of CDA jurisdiction, the United States Court of Appeals for the Federal Circuit has resolved two appeals similar to this one where the contract asserted provided a "benefit" to a foreign nation. The Court held that one contract was governed by the CDA, but the other was not. In both appeals, the Federal Circuit examined the statutory and legislative history of the authorization for entry into the asserted contract to determine whether the CDA governed the contract and provided a grant of jurisdiction to entertain the contract appeal.

In the first appeal, *United States v. General Electric Co.,* 727 F.2d 1567 (Fed. Cir. 1984), there was an agreement between the Air Force and General Electric Co. (GE) for procurement of jet engines that GE asserted was governed by the CDA. The government argued the opposite on the grounds that the agreement was a foreign military sales contract pursuant to the Arms Export Control Act (AECA) where the engines would be provided to and benefit a foreign nation (rather than the United States) and not be paid for with appropriated funds (but with monies furnished the United States by a foreign government pursuant to a separate agreement entered into with the Air Force). *Id.* at 1569-72.

In the second appeal, *G.E. Boggs & Associates, Inc. v. Roskens*, 969 F.2d 1023 (Fed. Cir. 1992), there was a "host country" contract between G.E. Boggs & Associates (Boggs) and Syria to improve the water supply to Damascus that was formally "adopted by" USAID as a contract of the United States pursuant to the Department of

---

[1] As we noted in *Zara*, 14-1 BCA ¶ 35,588 at 174,381, our jurisdiction to decide an appeal is typically governed by the CDA. In these early CERP appeals where appellant lacked benefit of counsel, we appear to have presumed (without expressly deciding) that there was a contract governed by the CDA at issue.

16

State Authorization Act Fiscal Years 1984 and 1985. Boggs asserted the contract was governed by the CDA but the government asserted otherwise. *Id.* at 1026-27.

In *GE*, the Federal Circuit held the contract between GE and the Air Force to obtain jet engines for a foreign nation was a contract governed by the CDA. The court concluded it possessed jurisdiction over the appeal pursuant to the CDA. In sum, it held that the contract between GE and the Air Force was a contract to procure goods (jet engines) and the fact a foreign nation benefited from and funded that contract were not relevant to or determinative of applicability of the CDA. 727 F.2d at 1569-72. The Court examined both AECA and the statutory authorization for foreign military sales. It stated:

> Congress contemplated that sales under the Arms Export Control Act would be at no cost to the government. It also contemplated payment should be provided to the contractor. Pursuant to the Act, the foreign government could be required to deposit money in a trust fund, which would be used to pay the contractor.... [T]he non-appropriated funds exclusion is limited to instances when, by law, appropriated funds not only are not used to fund the agency, but could not be. It is clear that the Air Force and Department of Defense have authority to use appropriated funds to the extent appropriated....

*Id.* at 1570. The appeals court added, under AECA, the President may, without requirement for charge to any appropriation or contract authorization, enter into a contract for the procurement of defense articles or services for any eligible foreign country if such country agrees to pay not less than the full cost to the United States. *Id.* at 1570-71, *see also id.* at 1574 (concurrence of Judge Nies).

In *Boggs*, the Federal Circuit held the contract between Boggs and USAID to supply services/repair work for improvement of water supply in Damascus, Syria, was not a contract governed by the CDA. 969 F.2d at 1027-28. The Court concluded that neither it nor the ASBCA possessed jurisdiction over the appeal pursuant to the CDA. *Id.* The court examined the statutory and legislative history of the authorization for entry into the asserted contract, i.e., Department of State Authorization Act, Fiscal Years 1984 and 1985, Pub. L. No. 98-164, § 1004, 97 Stat. 1017, 1057. It determined that, after two terrorist attacks in Beirut, Lebanon, in which Syria may have played a role, Congress passed a joint resolution (as part of a continuing resolution making appropriations for FY 1984) directing USAID to terminate U.S. economic assistance to Syria and authorizing USAID to adopt as a contract of the United States any contract with a United States contractor which had been funded by USAID assistance prior to the resolution. *Id.* at 1025 25. Boggs' contract for work on Syrian water supply was one of

17

the contracts adopted by USAID pursuant to this provision. *Id.* at 1025. The appeals court agreed with the ASBCA that the contractual relationship between Boggs and USAID was not entered into for the purpose of procurement, but for the purpose of mitigating the effects of termination of economic assistance and related contracts dictated by the joint resolution. *Id.* at 1025-27. In distinguishing its prior holding in GE, the appeals court stated:

> General Electric directly contracted with an executive agency of the U.S. government to produce jet engines. The engines' final point of transfer was irrelevant to General Electric. By contrast, Boggs directly contracted with Syria to build the waterworks. The AID administrator never contracted to receive such a water system....

*Id.* at 1028.

Following the practice of the Federal Circuit in both *GE* and *Boggs*, we examine the statutory authorization for entry into CERP contracts and its legislative history to determine if the CDA governs such contracts and authorizes an appeal here. As we discussed above, when CERP began in 2003, it relied for funding upon monies soldiers seized in Iraq which were deemed to have been obtained by illicit skimming of oil sale profits in contravention of UN-imposed sanctions and determined not to constitute "miscellaneous receipts" of the U.S. Ambassador Bremer and the CPA administered contractual agreements funded with seized Iraqi assets pursuant to CPA Memorandum No. 4, "Contract and Grant Procedures Applicable to Vested and Seized Iraqi Property," which provided such contracts were not subject to the CDA of 1978, as amended. *See generally Agility Logistics*, 15-1 BCA ¶ 35,840 at 175,263; *MAC Int'l*, 10-2 BCA ¶ 34,591 at 170,510; *Laudes Corp.*, 84 Cl. Ct. at 303.

DoD believed CERP increased the flow of intelligence to commanders about hostile actors in the community, improving both security and economic conditions. As the seized monies which funded CERP approached exhaustion, DoD urged Congress to keep CERP the useful tool it was for commanders in the field "not encumbered by processes and procedures in other provisions of law." It asked Congress to appropriate funds to continue CERP "notwithstanding any other provision of law." DoD advised that the foregoing language was necessary in statutorily authorizing such funding to keep CERP a flexible and responsive tool unencumbered by procedures associated with procurement arguably required by law and implementing regulations if CERP relied on appropriated funds. Congress acquiesced to DoD's request and authorized funding of CERP in FY 2004 not to exceed $180 million "notwithstanding any other provision of law." Emergency Supplemental Appropriations Act for Defense and for the Reconstruction of Iraq and Afghanistan, 2004, Pub. L. No. 108-106, § 1110, 117 Stat. 1209, 1215; H.R. Conf. Rep. 108-337, at 7 (2003), *available at* https://www.

18

congress.gov/bill/108th-congress/house-bill/3289/text/pl; Martins, *No Small Change of Soldiering,* ARMY L. at 9-11, *available at* http://www.jagcnet.army. mil/DOCLIBS/ARMYLAWYER.NSF.

Thereafter, DoD issued guidance expressing its intent that the use of CERP appropriations "preserve the same flexibility and responsiveness...maintained with the original CERP that was funded with seized Iraqi assets." DoD also issued a new financial management regulation providing that, "[t]o the maximum extent practicable, these regulations shall be consistent with [CPA] Memorandum Number 4, Contract and Grant Procedures Applicable to Vested and Seized Iraqi Property...dated August 19, 2003," which specified that contracts funded from vested and seized Iraqi property were not subject to the CDA. DoD 7000.14-R, vol. 12, ch. 27, *available at* http://comptroller. defense.gov/Portals/45/documents/fmr/archive/12arch/ 12_27.pdf; Martins, *The Commander's Emergency Response Program,* 37 JOINT FORCE QUARTERLY at 50, *available at* http://www. dtic.mil/dtic/tr/fulltext/u2/ a523853.pdf.

In sum, it was the intent of Congress (and DoD) that CERP contracts funded with U.S. appropriations (like those funded by seized Iraqi assets) not be subject to the CDA. Accordingly, as we held in *Latifi,* we do not possess authority under the CDA to entertain appeals involving CERP contracts.[2]

---

[2] In *Latifi,* we did not follow the practice of the Federal Circuit of examining the legal authorization for entry into the asserted contract, but set forth a "benefit" analysis stating that there was no direct benefit to the United States from a CERP contract. 15-1 BCA ¶ 35,937 at 175,633. We note now that, in seeking millions of dollars from Congress to fund CERP contracts, DoD advocated such contracts were of benefit to it (and Congress apparently agreed). We additionally note that no "benefit" analysis is necessary here because the CDA does not state that contracts governed are only ones directly of benefit to the United States (as evidenced by the Federal Circuit's decision in *GE* that foreign military sale contracts are governed by the CDA). While there is *dicta* in both *Wesleyan Co. v. Harvey,* 454 F.3d 1375, 1378 (Fed. Cir. 2006); and *New Era Constr. v. United States,* 890 F.2d 1152, 1157 (Fed. Cir. 1989), referencing the existence of "direct benefit," neither case held that such benefit was necessary for the CDA to govern a contract. In *New Era Constr.,* 890 F.2d at 1157, the contractor did not possess a contract with the United States, only with a local housing authority. Relying on a long line of precedent that a separate contract between a housing authority and HUD did not furnish a contractor a right to sue HUD, the appeals court dismissed for lack of CDA jurisdiction due to lack of a contract with an Executive agency. In *Wesleyan,* 454 F.3d at 1378-79, the court of appeals held an unsolicited proposal and bailment agreement were donative in nature and did not involve "procurement" for purposes of the CDA but executive agency purchase orders also at issue in the appeal did constitute a procurement contract

Because the ASBCA Charter also provides for jurisdiction over appeals pursuant to provisions of contracts requiring a decision by the Secretary of Defense or by Secretary of a Military Department and over appeals where the Secretary of Defense or the Secretary of a Military Department has granted a right of appeal not contained in the contract on any matter consistent with the contract appeals procedure, 48 C.F.R. ch. 2, appx. A, part 1 (14 May 2007), the lack of CDA jurisdiction over CERP contracts does not end our analysis of jurisdiction here. Rather, we must also ascertain if there is any contract provision or directive that could serve as a basis for us to exercise jurisdiction. *Agility Logistics Servs.*, 15-1 BCA ¶ 35,840 at 175,267; *Latifi Shagiwall,* 15-1 BCA ¶ 35,937 at 175,634.

With respect to whether a right of appeal to this Board has been granted by provision of contract, the one-page contract relied on by A.A.K.C.C. as the basis for its appeal here contains no provision requiring a decision by the Secretary of Defense or Secretary of a Military Department. Moreover, we are unaware of, and neither party to the appeal has brought to our attention, any provision of a directive where the DoD Secretary or a Secretary of a Military Department has granted a right of appeal to the Board for CERP contracts not contained in those contracts on a matter consistent with our contract appeals procedure. Accordingly, the Board has no choice but to conclude that it lacks jurisdiction to entertain the appeal here. 48 C.F.R. ch. 2, appx. A, pt. 1 (14 May 2007); *Agility Logistics Servs.*, 15-1 BCA ¶ 35,840 at 175,267-68; *Latifi Shagiwall,* 15-1 BCA ¶ 35,937 at 175,634.

## CONCLUSION

The government's motion to dismiss for lack of jurisdiction is granted for the reasons set forth above.

Dated: May 29, 2019

TERRENCE S. HARTMAN
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

---

governed by the CDA. In sum, in both cases, the dismissals for lack of jurisdiction were based on lack of existence of a contract with an Executive agency, not lack of a direct benefit to the U.S. from the contract pleaded.

I concur

JOHN J. THRASHER
Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60399, Appeal of A.A.K.C.C., rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals